I'm Andrea Adam Broad. I represent the appellants in this case. If you could please keep your voice up. Pardon? Keep your voice up. I know we're at the end of a long calendar, and this case involves the interplay of various statutes and policies, which I think have been pretty thoroughly briefed. So I just want to focus our attention on what I think is the main issue in this case, which is whether a landlord who agrees to get involved in providing Section 8 housing can ever get out of that obligation. And I think what the position of the appellees in this case is that once you sign on, it's basically a life sentence. May I focus your attention on the part of this case that troubles me? You know, it seems to me what Congress did was to give tenants of this nature who meet certain requirements an ability to remain the landlord to get the difference in the spread. But what I'm troubled by is the concept that the landlord has to sign a contract, which is not specified, to my knowledge, in the regulations or in the law, which may contain any number of other requirements that were not contemplated by Congress. Can you enlighten me as to the nature of the contract, if you know it, in this case, that the landlord was asked to sign in order to be able to cash these vouchers? I agree with you. I think that it's a very troubling part of this. Before the landlord can get the money, the enhanced voucher money, first of all, he has to jump through a lot of other hoops before he signs the contract. He has to submit the property to various inspections. Just like he would under Section 8, as if he were starting out under Section 8, right? Right. And then he has to sign a contract as to every single remaining tenant. Okay. Now, under the statute, just say for discussion purposes, let's just say that Congress said, you know, we're not going to leave these poor people on the street. We're going to provide a way to make the landlord whole in terms of the difference between the market rent and what is previously being paid. It says nothing about this other. If the landlord chose, say for a moment we took that, the landlord says, you know, I've got eight tenants here in this 100-unit deal. I'm just going to eat the difference. I'm not going to cash these things, but I don't want to sign this contract. Why is that not an appropriate construction of the law? Because Congress didn't talk about that, did it? No. And I think that, in theory, that's actually what's been happening in this case. He has been eating the difference for a long time. I'm sorry. You need to keep your voice up. I'm sorry. That actually has been what has happened. I mean he's not been cashing the government vouchers? Correct. For how long? I can't tell. At least five years. Are they sort of an escrow so that he can eventually get access to them? No. Or is he just writing it off? Yes. Okay. As far as I understand it. Wait a minute. I just got a weasel on that. No, I don't think he's collected them. There are no contracts in place, and therefore he hasn't been getting enhanced vouchers. Do you know the details of the contracts? Maybe I asked this before, but do you know what these contracts that the landlord would have to sign in order to cash the vouchers say? What requirements are there? I don't know specifically all the requirements. Would your opposing counsel have a copy of any contract? Is there anything in the record that shows what was asked?  I don't believe the contract is in the record. Basically, there's nothing in the record. But we can hypothesize that the landlord would have to build a statue to the mayor, would have to provide free incense, would have to provide rides back and forth to the Giants games. Is that a fair reading? It's whatever goes. I think one thing that we do know is that the housing authority, local housing authorities, would be the ones who say this is what a fair market rent is. It's not really a rent. I understand that about the rent. That would be in the contract. That falls within what Congress kind of intended. But what about things besides the difference between what the tenant was paying and the market rent? I'm talking about the other things that can be imposed. I'm not sure what all the things that could be or would be imposed. Let me ask you this. I'm trying to figure out why your client doesn't want to take the money. That is, what's in it for him to go through all of this in order to get rid of these tenants? Because here's what I understand, and you can then correct me if I'm missing something, that he has been allowed to raise his rent. And the difference between what the tenants will pay out of their own pockets and what his rents are will be paid by the government. So there's no question about what he will get, the rent level that he's charging generally, not only to these people but to the other people in the apartment complex. Correct? No, I don't think so. First of all, it's anyone else he could charge what the market bears just based on the market price, whereas here it has to be the product of some sort of negotiation with the housing authority who comes up with its own comparables and says, well, this is what we think the market rent is. And in this case, it might not even be what he was getting before. And what does the housing authority look to to see what the market rate is? They look to their own set of what they say are comparables. It's not just determined by what somebody would... It's not other units in the building? No. It's comparing it to other buildings. So is there something in the record here that tells us that the rents allowed by the housing authority are in fact not the market rents for these apartments? No, because since the record was submitted, we have been trying to comply with Judge Armstrong and Judge LaPorte's orders, which ordered him to enter into these new contracts, and they haven't been entered into yet because there has been a disagreement about what the market rent is. So there's nothing on the record. But I want to go back for a second because we've been assuming that Congress created this right to remain in 1437 FT 1B. And I think that's where the problems begin, actually, because if you look at that statute, it doesn't say anything about owners at all. This is a right vis-a-vis HUD. This is a right to elect to remain because otherwise HUD might say, you know what, go to some other housing that's cheaper. So what it says is if you want to stay, HUD has to pay you this difference. That's what that statute is about. It doesn't mention owners. It doesn't say tenants' rights, Trump owners' rights. It doesn't say owners have to let every person who would like to remain remain. All it says is that HUD has to pay people who would like to stay. In theory, those people, they have to pay that subsidy to. They have to make up the difference between the market rate and the other rate. And the issue here is if that's true, if there were actually a right to remain vis-a-vis owners, then what's the sense of the opt-out? What's the sense of the notice provision? If there's this notice provision that says you have to give this very specific kind of notice, then you have to wait a year, and then you can get out of this Section 8 program. You can get out from under it. You don't have to be part of this HUD bureaucracy forever. What's the meaning of that? And now they're trying to argue, they try to argue in their brief that, they say on page 13 of their brief, they try to explain the notice provision by saying the following. They say, the notice statute does not create substantive rights to evict and raise rent, but rather establishes a procedural requirement to which the right to remain was subsequently added. What does that mean? Well, you know, and I'm sure you're aware, there are lots of cases. I wrote one involving an Oregon woman not too long ago. And it's not this section, but a different section. And it's very clear that Congress, when it has financed the construction of the place in the first place, or benefits of one kind or another to the landlord, is saying, okay, this is a quid pro quo here. We're going to give you this in exchange for your doing that. Okay? And in this case, Congress has said, at least arguably, you know, we gave you these original benefits. We're very concerned about people who might be left homeless. And therefore, what we're going to do is we're going to give the people who want to stay in the project an ability to stay on this condition. Number one, it can't be less rent than they're already paying. That's right in the statute. And number two, it's going to be a fair market rent. And we're going to pay the difference so the landlord is made whole. That's clearly what the scheme is. It's true in lots of statutes. The question then becomes, what other things can be imposed on the landlord? And that was the basis of my original question to you. You're saying, how do they determine fair market value? That's obviously something we need to talk about because in order for there not to be a taking, if you will, you may need to show that, in fact, this is a, you know, a benefit that makes a person, if not whole, at least there is a fair attempt to compensate the landlord, be mindful of what was done for the landlord before as a quid pro quo for letting people stay. Well, I mean, if you're talking about a quid pro quo, I mean, Mr. Howard has been providing Section 8 housing for 30 years. The question to me is, how do you make any sense of the opt-out provision if no one can ever actually opt out? If you have to wait until your tenant, all of your tenants die. That's the right, again, that's the question is, what does Congress have the right, having financed the place in the first place, and giving the tenant certain tax, I mean the landlord certain tax and other benefits, whether it may extract additional concessions, if you will, for which it allegedly pays by making a voucher available to make the difference between the fair market value and what was previously being paid. That's really what you're asking, is it not? Well, I think it's clear that they can make some other conditions. And the question is, if by passing the enhanced voucher statute, they were planning basically to repeal the opt-out statute. There's no evidence of that. I agree with you, that's why. At most, you've got as long as a person can live. I don't know how old these people are, but, you know, there's a certain. And their whole families, and their families, too, potentially. So you've got him trying to opt out and not being able to get out for potentially 20, 30, 40 years. Is that where the statute reads, or is it the tenant? Well, it's the tenant, but the tenant could be a family, as far as I can read the statute. What section would you cite in the law that would allow basically new people to come in? I mean, you know, like aunts and uncles. No, but they could be still already. I'm not saying they're new people, like, who are coming in, but it could be a family. So it could be grandma and the grandchild. I don't know. But here's my problem. I mean, my problem with your part of the case, I mean, I'm just reading the statute. Enhanced vouchers at 42 U.S.C. 1437F, parent T, parent 1, parent B. Enhanced vouchers in general. Enhanced voucher assistance under this subsection for a family shall be voucher assistance, except that under such enhanced voucher assistance, here it comes, the assisted family may elect to remain in the same project in which the family was residing on the date of the eligibility event for the project, and if during any period the family makes such an election, can you still reside, then we get the voucher. I mean, the assisted family may elect to remain. I don't find that ambiguous. Well, but this is vis-a-vis HUD. They may elect. It's possible that they will elect to remain. They may elect to go. How can you say that's vis-a-vis HUD? I mean, they're not going to remain in HUD housing. They're going to remain in the housing where they now are. They're going to remain, and if they do, okay, and also this and continues to so reside is important, because if the election were enough, then why do we need and continues to so remain? Well, I understand that perfectly. I think I do. If they move out, they're done. They can't move back in. That's true, but I think that the Continues to reside does. to me that there's something beyond an election that has to happen, i.e. Let me read the language. The assisted family may elect to remain in the same project in which the family was residing, and if during any period the family makes such an election and continues to so reside. I don't find the difficulty in that. It says may elect to remain, so if they've elected to remain. If they're here now, they elect to remain. So you don't need continues to reside, which is how the statute was amended in 2000 in order to change how it used to be, which it used to suggest the way it was before was that HUD could knock, HUD could send them somewhere else, and then they wouldn't have to pay the subsidy. So they wouldn't have to do it. So here you've got they make the election, and they continue to so reside because the landlord decides that they want to keep them as a tenant. I understand that the language was changed, and it restricts the ability of HUD to force them to go elsewhere, but I have trouble reading the may elect to remain language as just existing in the abstract, which means they can't remain in the house where they are because the assisted family may elect to remain in the same project. Well, they may elect. They may elect. It doesn't mean that they will get to remain. I can choose it, but I can't have it? You can express a preference to remain, but if you read it this way, then everything, every part of this decision is in the hands of the tenant. The owner has no say. That's how I read it. Okay. You know, let's hear from the other side. We've taken you over a little bit, but we'll make sure to give you a chance to respond. Okay. Thank you. Thank you. May it please the Court, my name is Kent Chen, and I represent the Appellees, the Park Village Apartments Tenants Association, all the tenants in this case. So here, this case comes in front of this panel on an appeal from a preliminary injunction order. So the standard review is abuse of discretion. So the district court should be upheld unless that it bases its decision on an erroneous legal standard or makes it. Let's talk about not the voucher, but the order to sign the contract. Where's the contract? The district court did, the contract is in the record, but the district court during the preliminary injunction hearing did print out copies of the contract and gave it to each party and asked the appellants what the objections were to the contract. And what authority is there under the statute for the district court to order someone to sign the contract? If they want to cash the vouchers, I understand there's a condition precedent. But if they just decide, as this landlord apparently has, that rather than subject himself to an ongoing obligation with local housing authorities, he'd just rather not cash that. Where's the authority in the statute that says that the district court can order that to be done? There's nothing explicit in the statute, but I think it flows from the language in the enhanced voucher statute. And what are the terms of the contract? Is there anything, you can just require anything he wants? A gift to his mother, a gift to the judge's children, perhaps an education, perhaps some kind of special benefit to the city or a campaign contribution. What's to limit what that contract says? The contract is promulgated by HUD. It's a standard form that HUD gives that's signed between the landlord and the housing authority. Okay. And that's not in the record? That's not in the record, but the district court judge did look at it and examined the contract and asked the appellants whether they had any objection. And where is the authority for that contract? Can you clarify the question? In other words, I understand the authority to issue an enhanced voucher. That's in the Act. I don't understand the part of the district judge's order that says you will sign this contract, because the statute simply doesn't talk about it. And even if you assume that that is a right that flows from the former that would require the landlord to take it, there's no discussion of what would be in there. It's absolutely wide open. They, for example, could require the landlord to change the roof every year or to repaint the walls every ten days or whatever else the HUD people wanted, and it's absolutely not provided for by statute. It's not provided by statute, but when Congress enacted a statute, there was a well-established HAP contract that HUD had promulgated. Was that included in the legislation? I don't believe it's included in the legislation, but the Congress ---- Is there any reference to it by anybody, any of the committee findings? I don't remember if there was. So at least for purposes of our review, we have to assume that HUD has carte blanche to do whatever it wants in this contract. Is that correct? I think it's HUD has to make the terms reasonable under that contract. That's a nice term. What does it mean? It can't, for example, force the owner to do so many things that would make it a taking. Okay. Now, that's a pretty extreme standard under Penn Central. Can HUD require certain maintenance obligations that could be extremely expensive? It does have a housing quality standard. Okay. Could it require the land? I don't know what this is, whether it's a masonry building. Could it require a retrofitting of a building for earthquake purposes? I don't believe it can. Why not? It's a safety issue. And it doesn't. I guess my point is I don't want to belabor it anymore, but the reality is this is absolutely bottomless. There is no cabining of the requirement there. I don't know where the district court gets the authority to require the landlord to sign this contract. I think the district court was also relying on the certification that the owner signed when it opted out of the Section 8 project-based program. Does that say that the landlord is willing to sign a carte blanche contract? Well, I think the district court also relied on the different cases that have required landlords to accept the beneficiary and sign the contract. The Jaunty case in Southern District, New York, and the Feimster case from D.C. I may be able to short-circuit this a little bit. I hope I can. The other side has objected to the order to sign the contract, and the other side was perfectly capable of putting into the record what the contract is or would be if they're required to sign it. I mean, we've got nothing in here from either side of you, and I would have thought that the party objecting to having signed the contract would have put in the contract that's proposed to them that they don't want to sign. On the other hand, I'm a little reluctant to affirm an order that simply says sign a contract that I've never seen. Would it be acceptable if you prevail on the merits, that is to say on the right to remain provided that they pay the rent through the enhanced vouchers, that we rule for, if we rule for you on the merits, and then remand with direction to the landlord that he permit these people to stay in accordance with our interpretation of the statute and in accordance with applicable regulations? Then the district court can kind of have another look at this. But I can't, I mean, I don't see the contract. I have no idea what's in the contract. Justice Judge Smith doesn't have any idea what's in the contract. I think we'd be fine with it, or we can submit supplemental briefing with the contract. But it's not in the record. It's not in the record. Well, you're not going to supplement the record. Do you think supplemental briefs are different from supplemental record? Yeah. Right. I think we'd be okay with that. Okay. So what do you do with the argument that they say, listen, there's nothing in here that says absolutely right to remain, and this may elect to remain as enforceable only against HUD and not against the landlord? And that's the argument as I understood it. Right. But, I mean, under the voucher program, the HUD doesn't have any say in where the tenants live. Under the voucher program, the tenants are the ones who choose where they live, and the statute itself only gives the tenant the right to remain or not to remain. The appellants have argued that the local housing authority basically uses some, I gather, unorthodox methods of determining what is a fair market value for the property. How does the housing authority go about determining what ultimately is, what HUD pays between the difference in the rent that was being paid at the time of the notification and when the voucher is issued? What the local housing authority in this case, the Oakland Housing Authority does, is that it looks at comparable properties from its database that includes both assisted units, units assisted with vouchers, and only assisted units on a private market. So it has a database of these units, and it searches the database for properties that are comparable to the property in this case. If the landlord has elected to depart the program, is saddled with the tenants who are going to remain under this section, but basically wants to get out in the open market again and Congress is trying to make them whole as an incentive to stay there, let the people stay there, why wouldn't it just be a regular fair market value deal where you'd have an appraiser come in and do something like that? I mean, if you're looking at properties that are still under Section 8, that's not a fair comparison, is it? Well, it's the comparisons both with property in Section 8 and property sales in Section 8. And the owner can – The reality is that has nothing to do with it. I mean, the statute says that the rent that was being paid before the notice is given, that's the floor. You can't go lower than that. But it doesn't say what the upper part is, at least under the statute that I have right here. That's the tenant's portion of the rent. I understand that. That's what the tenant pays. But the question is how you determine what the government pays. And I'm understanding you to say that the government, in this case the Housing Authority, uses a database that includes other Section 8 housing. I'm saying that's not right. That can't be right because what the landlord is doing is saying if I get my property out of Section 8, I can go on a fair market value basis, go into the regular market. That's your comparative situation. To compare it with the Section 8 housing is basically to give no reward at all. How can that be right? The Section 8 housing in those cases are the voucher, the tenant-based voucher cases, not the previous project-based. So those are rented at market rate. In this case, the government is supposed to pay the difference between what was paid before and the fair market value. And it sounds like what the tenant, what the Housing Authority is doing here is to say, well, we're going to give you the difference, if any, between what was paid before and other people in a comparable situation in Section 8 housing. It's comparable in terms of the landlord can also, if it did rent out other units in the same building to non-Section 8 tenants. Right. Which it can do after the opt-out. It can also use those units as comparable units. But as I understand it, the building is vacant. Then you've got the landlord controlling the comparable. I mean, there's supposed to be a fair market value where you get, there's well-known principles of how you determine fair market value. You've got appraisers that come in and do that. Why isn't that the standard? Maybe I can short-circuit this one, too. Is the question as to the level of the rent in front of us at this time? No. The question is whether the tenants have a right to remain. The fair market rent issue can be had another day. Okay. Yeah, as I understand it, that has not now been presented to us as a litigated question or an appealed question. Yeah. So I think also the right to remain issue with the vouchers, I mean, the HUD has also promulgated regulations on that. And all the case law that you've seen in our briefs also have granted the tenants the right to remain. So we believe that that issue is clear, that a tenant has the right to remain. And two of the cases have said that they can, the court can require the landlord to execute a voucher, execute a contract with the tenants. And who said which cases are these? This is the John T. case from the Southern District in New York. And that's a district court, right? District court case. What does that mean to us? No disrespect intended to my learned colleague to the left. District courts are sometimes right. I know that. But I mean, what does what the Southern District of New York says about this particular issue mean for our purposes in the Ninth Circuit? That's what I'm going to go next. In the D.C. case, the Feenster case actually did specifically require the owner to execute a contract. What's the citation on those two cases? The Feenster case is 548F3, 1063. That's the D.C. Circuit opinion. And your representation is that the court ordered the landlord to execute a particular contract, right? Right. The district court did, and it was firm on appeal. At least that part of the decision was affirmed on appeal at the D.C. Circuit. Okay. And what's the Southern District case? Southern District case is the John T. v. Shore Terrace case. And what's the cite on that, please? The cite is 2004, Westlaw, 1794496. 4496? Yes. Okay. And the pen cite is Star 4. It's what? Star 4. Star 4. Okay. Okay. Thank you. Thank you. Okay. How about one minute? Talk fast. I believe that the Gene T. case, although it holds that owners must accept enhanced vouchers, it doesn't hold that they have to enter into new contracts. How about the Feenster case, the D.C. Circuit case? The Feenster case is correct. They do make them sign contracts. And is your objection to what's in the contract, or is your objection to they can't make us sign a contract? Well, certainly they can't make us sign a contract. There's no statutory authority for that. And do you make any objection to your brief because of the specific things that are provided in the contract, or are you simply saying they can't oblige us to enter into a contract? We only said the latter. So you're not fighting about what's in the contract? Well, I mean, now we would be fighting about it because of the amount of the rent that they're claiming is the fair market rent. But the other issue is that HUD reserves the right to change these contracts. You have not been ordered by the district court to enter into a specific contract specifying amounts. You've just been ordered to enter into a contract. Yes. Okay. The other thing is that HUD reserves, and the Housing Authority, they reserve the right to change these contracts every year according to whatever they want. This is not a contract that just exists forever and you just keep renewing it. They can change it whenever they want. Part of what happened in this case is that part of the reason that the appellants didn't want to sign the contract is because- You know, I have to say that when all is said and done, I read the statute differently from the way your client does and the way you do, and I read the statute as saying, listen, if you take the benefits, you take the burdens. Your client took the benefits and doesn't want the burdens. Well, he's taken the burdens for 30 years. Well, but that's not the extent of the burden under the statute. Well, there is an opt-out statute, which I don't see how it's meaningful if you can never opt out. It's a perfectly sensible provision. It says, listen, we're going to let you opt out, but we're not going to disturb the tenants who are in there now. That's a perfectly sensible thing to do. Your client may not like it, but that's how I read the statute and it does not seem to be nonsensical. Okay, but what the opt-out statute says is in the event the owner does not provide the notice required, the owner may not evict the tenants or increase the tenant's rent payment until such time as the owner has provided the notice and one year has elapsed. So- At which point he can raise the rent. Well, he can't raise the tenant's rent. He can only ask for the market rent, but it doesn't change the tenant's rent at all because the tenant's rent under their interpretation of the statute is still determined by HUD. But he can raise the rent for which he can receive for that particular unit because it's the tenant payment plus the voucher. But that's actually- Whether he's been given fair market value. That's not the tenant's rent, though, actually. I mean, what it says here is the tenant's rent. Okay. He also can't evict the tenants, which it says he could do under the opt-out. Got it. Okay. Okay. Thank you. Thank you very much. The last case is now submitted. That case is Park Village Apartment Tenants Association v. Mortimer Howard Trust, et al. That completes our arguments for this morning at long last. Now, I understand there's some law students here. Is that correct? Yes? No? How many? All there. Oh, my goodness. Now, I had previously indicated that one or more of us would come out after conference. It's awfully late. You know, I've got a law clerk here who can tell them everything they need to know. So if you don't mind, we'd like to be able to do our conference. And what we might do, we'll do the conference. If somebody stays, I don't mind coming out and chatting, but I can't guarantee how long the conference will be. Yeah. I'd be happy to come out. But given the number of cases we have, the conference may be very lengthy. And I hate to make people wait. We'll say we'll stick our heads out the door. And if no one's here, we'll know the answer. OK. Thank you. Then I'll excuse my law clerk. I know you sometimes talk to the students. So then you're excused. We can do both. You can talk to the law students. OK. Thank you.
judges: Todd, Fletcher W. , Smith M.